# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 18-08V
### Filed: February 24, 2021
PUBLISHED

|  |  |
|---|---|
| BETTY DUESTERHEFT, as Personal Representative of the ESTATE OF RONNIE DUESTERHEFT, deceased, <br><br>           Petitioner, <br><br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br>           Respondent. | Special Master Horner <br><br><br> Finding of Fact; Shoulder Injury Related to Vaccine Administration; SIRVA; Influenza (flu) Vaccine; Onset |

*Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA,* for petitioner.
*Adriana Ruth Teitel, U.S. Department of Justice, Washington, DC,* for respondent.

## FINDING OF FACT[1]

On January 2, 2018, Ronnie Duesterheft filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012),[2] alleging that as a result of an influenza ("flu") vaccination that received on September 23, 2015, he suffered a suffered a right shoulder injury.  (ECF No. 1.)  On November 8, 2020, Betty Duesterheft was substituted as petitioner in her capacity as personal representative of Mr. Duesterheft's estate.  (ECF No. 28.)

Respondent recommended that compensation be denied, arguing, *inter alia*, that there is not preponderant evidence that Mr. Duesterheft's shoulder pain began within a timeframe that would support a finding of vaccine causation, namely 48 hours for a

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

Shoulder Injury Related to Vaccine Administration or "SIRVA." (ECF No. 18.) On July 20, 2020, petitioner moved for finding of fact regarding onset in this case, requesting a finding that onset of Mr. Duesterheft's shoulder pain occurred within 48 hours of the vaccination at issue. (ECF No. 35.)

For the reasons described below, I now issue the below finding of fact. I conclude that there is not preponderant evidence that Mr. Duesterheft's right shoulder pain began within 48 hours of his September 23, 2015 flu vaccination.

## I.      Procedural History

Mr. Duesterheft filed his petitioner on January 2, 2018, along with supporting medical records and a Statement of Completion. (ECF Nos. 1, 5.) This case was originally assigned to the Special Processing Unit ("SPU"). (ECF No. 4.) On December 6, 2018, respondent filed his Rule 4(c) report, recommending against compensation. (Ex. 18.) Thereafter, this case was reassigned to Special Master Roth. (ECF No. 20.)

Special Master Roth held an initial status conference on March 19, 2019. (ECF No. 21.) During this conference, Special Master Roth presented her review of the records and indicated that petitioner's first documented complaint of shoulder pain was approximately six months after receiving the flu vaccination. (*Id*.) Petitioner then submitted witness affidavits from David Childress and Jo Anne Germer. (ECF No. 22.)

Another status conference was held on October 16, 2019. (ECF No. 25.) During this conference, the parties discussed proceeding via videotaped deposition in lieu of a fact hearing regarding the onset issue. (*Id*.) However, on November 8, 2019, Betty Duesterheft substituted as petitioner following the death of Mr. Duesterheft. (ECF Nos. 26-27.)

Thereafter, on July 20, 2020, petitioner filed this motion for a finding of fact on the record regarding the issue of onset. (ECF No. 35.) Respondent filed his response to petitioner's motion on September 10, 2020. (ECF No. 37.) No reply was filed.

This case was reassigned to my docket on January 28, 2021. (ECF No. 40.) I advised that, if the parties were not interested in exploring settlement, I intended to act on the pending motion based on the existing record. (ECF No. 41.) On February 11, 2021, the parties filed a joint status report indicating that the parties were not interested in exploring informal resolution in this case prior to the resolution of the pending motion. This motion is now ripe for consideration.

## II.      Factual History

### a.  Medical Records

Prior to the vaccination at issue, Mr. Duesterheft had a history of lymphoma, anemia, leukocytosis, cough, bronchitis, wheezing, and left lower extremity muscle

cramping.  (Ex. 3, pp. 17-24, 106.)  He did not, however, have any shoulder-related complaints.  On December 27, 2012, Mr. Duesterheft fell on his right side while he was hunting and was treated for right rib pain.  (*Id*. at 33.)  During a neurology follow up on January 2, 2013, slight right foot drop was noted.  (*Id*. at 131.)

On September 23, 2015, Mr. Duesterheft was seen by his primary care physician, Dr. Kimberly Wheeler, for gout and for a hand tremor attributed to steroid use for Hansen's disease and prior chemotherapy.  (Ex. 3, p. 14.)  His exam was normal except for mild intention tremor in both hands.  At this visit, he received the flu vaccine at issue in his right deltoid.  (Ex. 1.)

On October 26, 2015, about 34 days after his vaccination, Mr. Duesterheft had a routine oncology exam with Dr. Rene Castillo.  (Ex. 3, p. 91-92.)  At this appointment, Mr. Duesterheft denied muscle weakness and did not report any shoulder issues.  (*Id*. at 92.)  A physical exam reported generally "[n]o arthritis, joint swelling, or joint pain," but without reference to any specific joint(s).  (*Id*.)

On December 9, 2015, about two and a half months after his vaccination, Mr. Duesterheft presented to a neurologist, Dr. Toan Vu, for a follow-up regarding the tremors in his hands.  (*Id*. at 87-88.)  He denied extremity weakness or numbness and did not mention any bicep or shoulder issues.  (*Id*. at 88.)  The neurologist specifically documented a motor examination that indicated normal muscle strength of the deltoids, biceps, and triceps. (*Id*.)

On January 19, 2016, Mr. Duesterheft presented to his cardiologist, Dr. Mohamed Eineddin, for a routine visit; according to the review of systems he did not report muscle aches, weakness, arthralgia, joint pain, back pain, shoulder pain, or bicep pain.  (*Id*. at 81.)  The physical exam did not address his extremities.  (*Id*. at 82-83.)

 Mr. Duesterheft first reported shoulder pain to his chiropractor on March 7, 2016, approximately six months post-vaccination.  (Ex. 2, p. 2.)  This report was made in the context of shoulder, neck, and lower back pain.  Upon exam, he had a reduced range of motion; he was diagnosed with radiculopathy.  (*Id*.)  Onset of the shoulder pain was not identified, but the cause of the right shoulder condition was indicated as "reaction to vaccination."  (*Id*. at 3.)  Two days later, on March 9, 2016, Mr. Duesterheft returned to his neurologist for a follow-up of tremors.  (Ex. 3, p. 80.)  He denied weakness or numbness of his extremities; upon exam, he again had documented normal strength in his deltoids, biceps, and triceps.  (*Id*.)  However, the motor exam notation appears likely to have been copied over from the December 9, 2015 visit.  (*Compare* Ex. 3, p. 80 to Ex. 3, p. 88.)  In any event, no shoulder complaints were documented.  (*Id*.)

Mr. Duesterheft returned to the chiropractor on March 14, 2016, complaining of right shoulder pain radiating down to his lower arm.  Upon exam, he had a limited range of motion in his cervical and thoracic spine.  (Ex. 2, p. 5.)  He presented again to the chiropractor on March 28, 2016, with continued right shoulder pain radiating into his lower arm and a limited range of motion.  (*Id*. at 6.)

On April 27, 2016, Mr. Duesterheft returned to his oncologist, Dr. Castillo, for a follow-up. (Ex. 3, p. 73.) He reported that his main issue that day was right shoulder pain despite physical therapy. (*Id.*) "Mild limited motion in the right upper extremity" was confirmed on physical examination and an orthopedic follow up was recommended. (*Id.* at 75.) No discussion was documented regarding either the cause or onset of the shoulder pain. Subsequently, Mr. Duesterheft pursued massage therapy for right deltoid pain from May 31, 2016 to June 30, 2016. (*See generally* Ex. 8.) On July 15, 2016, Mr. Duesterheft presented to his primary care provider with cough and fever. (Ex. 3, pp. 11-13.) He did not report any shoulder complaints. (*Id.*)

On July 21, 2016, Mr. Duesterheft presented to an orthopedist and reported right shoulder pain of a spontaneous onset since September of 2015. (Ex. 5, p. 20.) No cause for the spontaneous onset of shoulder pain was documented. Physical exam showed reduced range of motion but was negative for pain with motion. (*Id.* at 21) Muscle strength was normal, but there was possible muscle atrophy at the supraspinatus and infraspinatus. (*Id.*) X-ray showed mild to moderate glenohumeral arthrosis with marginal osteophytosis. (*Id.*) Diagnosis was limited to "Pain in right shoulder" with a differential diagnosis including rotator cuff tendinopathy or tear, biceps tendinopathy or tear, glenohumeral arthritis, and adhesive capsulitis. Follow up MRI was recommended. (*Id.*)

An MRI was conducted on July 22, 2016. (Ex. 5, p. 24.) The study showed: moderate glenohumeral degenerative osteoarthritis; age-related degenerative rotator cuff and proximal biceps tendinosis; medium grade articular surface partial tear at the insertion of the subscapularis tendon; focal low-grade articular surface and interstitial partial tears of the supraspinatus tendon; and mild acromioclavicular degenerative osteoarthritis. (*Id.* at 24-25.) At a follow-up visit on July 26, 2016, Mr. Duesterheft was diagnosed with primary osteoarthritis of the right shoulder. (*Id.* at 17-19.) Again, no discussion regarding the cause of petitioner's shoulder pain was documented. Mr. Duesterheft began physical therapy on August 22, 2016, with an intake diagnosis of osteoarthritis; however, he reported that his right shoulder pain "began in sept. 2015 after receiving a flu shot." (*Id.* at 29-31.)

During a follow-up appointment on September 19, 2016, Mr. Duesterheft's orthopedist documented that petitioner reported that he believed that he was given a flu vaccine too high, and the injection went into the shoulder bursa rather than into the muscle. (*Id.* at 13-14.) The orthopedist noted that Mr. Duesterheft's differential diagnoses included pain and stiffness from arthritis and pain and stiffness from adhesive capsulitis, "which may or may not be results of the flu injection as he states." (*Id.* at 15.) Mr. Duesterheft was discharged from physical therapy on September 26, 2016. (*Id.* at 26-28.)

When Mr. Duesterheft returned for a follow-up visit on December 6, 2016, he brought literature regarding SIRVA to his appointment. (*Id.* at 7-8.) According to the orthopedist, this literature included discussion of needle overpenetration. (*Id.*) Mr.

Duesterheft returned to his orthopedist on January 23, 2017, and April 24, 2017.  (*Id*. at 2-7.)  No further medical records were filed.  Mr. Duesterheft passed away on July 23, 2019, due to natural causes unrelated to this action.  (Ex. 14.)

**b. Affidavits**

**i. Ronnie Duesterheft**

Mr. Duesterheft submitted two affidavits in this case.  The first affidavit was filed with the petition and indicated that he experienced pain in his right shoulder "immediately following vaccination," but was otherwise silent as to the details of his medical history.  (Ex. 9.)  Subsequently, after respondent set forth his defense in his Rule 4 report, Mr. Duesterheft filed a more detailed affidavit on May 20, 2019.  (Ex. 13.)

 Mr. Duesterheft stated that on September 23, 2015 he received the flu vaccine. He was standing and the administrator was standing.  She was shorter than him and the shot was given at an upward angle.  He had immediate pain and burning.  (Ex. 13, p. 1.) Mr. Duesterheft submits that on the date of vaccination he used both ice and heat over a period of time for the pain and burning.  (*Id*.)  He indicated that he experienced reduced range of motion and could not fish, hunt, garden, or sleep on his right side, without pain.  He indicated that his shoulder sometimes "is locked" at night and also that his condition got worse over time.  (*Id*.)

Mr. Duesterheft averred that "I asked each and every Doctor about the pain and if a flu shot could cause this much pain. Dr. Rene Castillo, Dr. Kimberly Wheeler, and Dr. Donald Willis all said that they never heard of a flu shot causing this type of pain.  I don't know why these complains are not noted in my records." (*Id*.)  He indicated that a brochure he saw at San Antonio hospital caused him to realize how and why a flu vaccine can cause a shoulder condition, leading him to bring this to his orthopedist's attention on November 21, 2016.  (*Id*. at 2.)  Describing his condition, Mr. Duesterheft concluded that "[t]here is no question in my mind that the flu shot caused this."  (*Id*.)

**ii. Betty Duesterheft**

Mrs. Duesterheft filed her affidavit on March 13, 2020, after being substituted as petitioner.  (ECF No. 32; Ex. 16.)  She averred that Mr. Duesterheft told her on the date of the vaccination at issue that it had hurt "more than the flu shot normally did." (Ex. 16, p. 1.)  She recalled that he attempted to use ice and heat to no avail and when he showered, he could not reach across his body.  (*Id*. at 1-2.)  Mrs. Duesterheft recalled that following the vaccination her husband could no longer drive and that they cancelled a trip to go to a great nephew's wedding because of this.  (*Id*. at 2.)  She observed him to be "in misery" and unable to do normal everyday activities.  (*Id*.)  She averred that after the pain "had not let up the first few days" she "noted on the calendar on September 27, 2015 that he had a reaction his flu shot, because his pain and issues had continued." (*Id*.)  Mrs. Duesterheft could not "remember the exact time he started considering going to see a doctor about his pain," but noted that he did eventually see a

massage therapist and an orthopedic surgeon.  (*Id*.)  However, she characterized him as "presenting for treatment in March of 2016."  (*Id*.)

### iii.   David Childress

Mr. Childress is a retired teacher.  He knew Mr. Duesterheft for 30 years.  They were good friends, were both part of the Maxwell Community Volunteer Fire Department, and went to the same church.  (Ex. 11, p. 1.)  Mr. Childress stated that petitioner did not say much about the flu shot other than "it hurt like hell after," that he spoke to a few doctors who told him they did not believe the flu shot would cause such pain, and that he found a brochure that said the vaccine can cause pain if not given correctly.  (*Id*.)  Mr. Childress stated that Mr. Duesterheft asked him if he thought the chiropractor would help, indicating that the chiropractor Mr. Duesterheft ultimately saw was Mr. Childress' chiropractor.  (*Id*.)  Mr. Childress reported that petitioner later showed him his range of motion of the right arm and that he could not reach across his body and had little movement behind his back.  (*Id*.)  Mr. Childress affirmed that he and petitioner never discussed dates.  That petitioner never had a problem before the flu shot and did what he could do at the fire station.  (*Id*.)

### iv.   Jo Anne Germer

Ms. Germer provides details about petitioner's standing in the community and having known him since the 1970s.  (Ex. 12, pp. 1-2.)  She states that she noticed in the fall of 2015 that petitioner was not moving his shoulder and seemed to be injured.  (*Id*. at 1.)  He told her he had received a flu vaccine that was extremely painful and that since the vaccination he did not have range of motion in his right shoulder.  (*Id*.)  She reports that she regularly asked about his shoulder pain and that he had no improvement and was greatly disappointed by that.  She submits that she spoke to him several times in the month prior to signing her affidavit and he was still dealing with the pain.  (*Id*. at 1-2.)

## III.   Standard of Adjudication

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 300aa-11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony.  *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).

Petitioner must prove by a preponderance of the evidence the factual circumstances surrounding her claim.  § 300aa–13(a)(1)(A).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems).  *Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Doe v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010) ( "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd, Rickett v. Sec'y of Health & Human Servs.*, 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion).  This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl .Ct. 537, 543 (1992) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"), *aff'd*, 993 F.2d 1525.  As the Federal Circuit noted, the weight afforded to contemporaneous records is due to the fact that they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium."  *Cucuras*, 993 F.2d at 1528.

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence.  *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir.), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992) (*citing United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).  However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should

be accorded less deference than those which are internally consistent") (*quoting Murphy*, 23 Cl. Ct. at 733).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 203–04 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).  In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

The specific issue of determining the onset of symptoms in a SIRVA case has arisen repeatedly.  Important to that point given the short 48-hour onset period identified by the Vaccine Injury Table, the Vaccine Act instructs that the special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such a period." §300aa-13(b)(2).  However, consistent with petitioner's burden of proof overall, that finding must be supported by preponderant evidence.  *Id*.

In prior decisions it has been held that neither a delay in seeking treatment in itself, nor a failure to report symptoms to a specialist or emergency room provider prior to later seeking treatment, is necessarily dispositive of whether a petitioner's shoulder pain began within 48 hours of vaccination.  *See Forman-Franco v. Sec'y of Health & Human Servs.*, No. 15-1479V, 2018 WL 1835203 (Fed. Cl. Spec. Mstr. Feb. 21, 2018); *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140 (Fed Cl. Spec. Mstr. Mar. 30, 2018), *mot. rev. denied* 142 Fed. Cl. 329 (2019); *Gurney v. Sec'y of Health & Human Servs.*, No. 17-481V, 2019 WL 2298790 (Fed. Cl. Mar. 19, 2019).  For example, in *Williams v. Secretary of Health & Human Services*, I found that the petitioner had established onset within 48 hours even though he had delayed treatment for his shoulder injury by months and had not taken the first opportunity to report his symptoms.  No. 17-1046V, 2020 WL 3579763, at *2 (Fed. Cl. Spec. Mstr. Apr. 1, 2020).  In that case, however, petitioner's care providers provided testimony supporting petitioner's contention that he had reported his symptoms earlier than the medical records indicated.  *Id*. at *3-6.  Moreover, the intervening medical appointment was only for a prescription check.  *Id*.

Delays in seeking shoulder-related treatment have contributed to findings against prior SIRVA claims.  This typically occurs when the contemporaneous medical records that do exist reflect a course of treatment inconsistent with an immediate post-vaccination onset or have otherwise been contradictory to petitioner's allegation of immediate post-vaccination onset.  *See e.g.*, *Small v. Sec'y of Health & Human Servs.*, No. 15-478V, 2019 WL 6463985, at *11 (Fed. Cl. Spec. Mstr. Nov. 1, 2019); *Demitor v. Sec'y of Health & Human Servs.*, No. 17-564V, 2019 WL 5688822, at *10 (Fed. Cl. Spec. Mstr. Oct. 9, 2019); *see also Lavender v. Sec'y of Health & Human Servs.*, No. 18-1921V, 2021 WL 667187 (Fed. Cl. Spec. Mstr. Jan 25, 2021).

## IV.    Discussion

In this case, it is apparent from the medical records that Mr. Duesterheft at some point concluded that his shoulder pain was related to his vaccination.  However, he did not report this to any of his care providers until approximately six months later when he first indicated to a chiropractor on March 7, 2016 that he felt he had had a vaccine reaction.  (Ex. 2, p. 3.)  At that time, despite the suggestion of a vaccine reaction, onset was not specifically discussed and the shoulder pain was presented in the context of neck and back pain and felt to be radiculopathy.  (*Id.*)  In the interim, Mr. Duesterheft had presented to three different physicians without complaining of shoulder pain.  (Ex. 3, pp. 83, 88, 92.)  Two of these appointments purported to include musculoskeletal examinations that indicated no relevant findings.  (*Id.* at 88, 92.)  It was not until July of 2016 that Mr. Duesterheft began indicating to his orthopedist that his shoulder pain began in September of 2015.  (Ex. 5, p. 20.)

Petitioner seems to contend that Mr. Duesterheft's earliest medical records should be given less weight, arguing that "Mr. Duesterheft's medical records are not perfect due to his providers' lack of recording of his complaints and lack of understanding and/or belief that a flu vaccination can cause shoulder pain."  (ECF No. 35, p. 6.)  This is unpersuasive insofar as the only fault petitioner raises with the medical records is the lack of confirmation of the symptom(s) being contested.  Moreover, nothing in these physicians' medical records confirms Mr. Duesterheft's assertion that they were incredulous regarding his description of symptoms[3] and only petitioner's own much later histories suggest that any symptoms went unrecorded.  *See, e.g.*, *Vergara v. Sec'y of Health & Human Servs.*, 08-882V, 2014 WL 2795491, *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those *recorded in later medical histories*, affidavits, or trial testimony" (emphasis added).).

Mr. Duesterheft's affidavit statement that he experienced shoulder pain "immediately" following his vaccination, which is contrary to what is evidenced in the contemporary medical records, is supported by recollections gathered in an affidavit (his second) that was created about three and a half years after the vaccination at issue.

---

[3] Mr. Duesterheft's orthopedist, Dr. Baker, later acknowledged being previously unaware of SIRVA (Ex. 5, p. 9.); however, Dr. Baker's acceptance of the condition is not at issue in determining the significance of Mr. Duesterheft's earlier treatment records from other medical providers.

(Exs. 9, 13.)   Although he discussed no longer being able to pursue his hobbies, he did not anchor his recollection to any specific instances.  Moreover, his affidavit does include discrepancies that provide evidence of an unreliable recollection regarding Mr. Duesterheft's interactions with his physicians.

Mr. Duesterheft stresses that prior to understanding the how and why of vaccine-related shoulder injuries, he asked "each and every doctor" if a flu shot could cause the pain he was experiencing and each doctor told him they were unaware of such a possibility.  (Ex. 13, pp. 1-2.)  He specifically indicated that he spoke to his oncologist, Dr. Castillo, his primary care physician, Dr. Wheeler, and his urologist, Dr. Willis.  (*Id*. at 1.)  However, Mr. Duesterheft's records reflect that he did not see either Dr. Wheeler or Dr. Willis during this period.  (Ex. 6.)  Mr. Duesterheft saw Dr. Willis on March 10, 2014, and did not return again until September 29, 2016, over a year after the vaccination at issue.  (Ex. 6, pp. 3-4.)  He received the subject vaccination at an appointment with Dr. Wheeler, but did not return for any primary care until July 15, 2016.  (Ex. 3, pp. 11-13.)  At that time, however, he was seen by a physician's assistant, Barbara Bolek.  (*Id*.)  Mr. Duesterheft did not see Dr. Wheeler again until September 12, 2016.  (*Id*. at 8-10.)  By the time of these appointments with Drs. Wheeler and Willis, Mr. Duesterheft was already under orthopedic care and pursuing physical therapy.  It was also around this time he is recorded as having relayed to his orthopedist that he felt his injury was vaccine-caused.[4]  (Ex. 5, pp. 14, 26-28.)

Even setting aside these inconsistencies, the course of Mr. Duesterheft's medical history itself provides further reason to credit the medical records over his subsequent and contradictory testimonial evidence.  Mr. Duesterheft's history during this period included multiple musculoskeletal examinations, including physical exam of the upper extremities by a neurologist on December 9, 2015, prompted by his care for hand tremors.  (Ex. 3, p. 88.)  Dr. Vu specifically recorded having checked Mr. Duesterheft's biceps, triceps, and deltoids, as part of an upper extremity examination and recorded no significant findings.  (*Id*.)  While the physical exam purportedly conducted by his oncologist may have been less likely to include anything more than a cursory evaluation of his extremities (Ex. 3, p. 92), Dr. Vu's more detailed notes, as well as the fact that Mr. Duesterheft was being seen for an upper extremity condition, albeit unrelated, make it far less likely that pain or a reduced range of motion would have gone unrecorded (Ex. 3, p. 88).  Moreover, Dr. Vu was not among the physicians that petitioner identified as being unaware of or skeptical regarding post-vaccination shoulder pain.  (Ex. 13, p. 1.)  Additionally, the fact that Mr. Duesterheft saw several different medical providers during

---

[4] Petitioner indicated at his September 19, 2016 orthopedic visit that he felt his condition resulted from his vaccination. (Ex. 5, p. 14-15.)  However, he also suggested in his second affidavit that at some point he began researching SIRVA after finding a Vaccine Information Sheet at the San Antonio hospital. (Ex. 13, p. 2; Ex. 10.)  He does not provide any detail in his affidavit regarding the circumstances that led him to discover and review the vaccine information sheet (Ex. 10).  Nor does he indicate when this occurred. (Ex. 13.)  However, he did suggest that this culminated in his specific recollection of being seen by Dr. Baker on November 21, 2016 and being diagnosed with adhesive capsulitis on that date.  (Ex. 13, p. 2.)  However, Dr. Baker's records appear to reflect that this conversation occurred at the following appointment on December 6, 2016.  (Ex. 5, pp. 8-10.)

the six months following his vaccination reduces the likelihood that the absence of any complaint of shoulder pain was due to error or omission on the part of the physicians.

In any event, Mr. Duesterheft's intimation that his records were silent regarding his shoulder condition because his physicians were dismissive of his concern is also unpersuasive. Dr. Castillo, one of the three physicians that purportedly failed to appreciate and record his arm pain was, in fact, the first of Mr. Duesterheft's physicians to record that he was suffering arm pain and responded by recommending an orthopedic follow up. (Ex. 3, pp. 73, 75.) This contradicts any suggestion or inference by Mr. Duesterheft that Dr. Castillo was dismissive of his complaint generally.[5] Moreover, following the vaccination at issue, Mr. Duesterheft did not seek any care from his primary care provider at all until July 16, 2016. (Ex. 3, pp. 11-13.) This appointment was specifically for a cough and fever and by this point Dr. Castillo had already recommended orthopedic follow up. In fact, this primary care appointment was less than one week prior to Mr. Duesterheft's first orthopedic appointment.[6]

I have also considered the additional witness affidavits filed by petitioner. However, even if crediting these affidavits as some evidence that onset of Mr. Duesterheft's shoulder pain was earlier than reflected in the medical records, they lack sufficient detail to be persuasive in establishing onset within 48 hours of vaccination. Mr. Childress indicated that "[w]e never discussed dates," but indicated that he discussed Mr. Duesterheft's shoulder pain in connection with his seeking chiropractic care, which began in March of 2016. (Ex. 11.) As noted above, the later medical records show that Mr. Duesterheft did come to associate his shoulder pain with his vaccination. Accordingly, the fact that he at some unspecified time relayed the same belief to members of his community is not in itself illuminating. Ms. Germer did indicate a direct observation that she noticed Mr. Duesterheft acting injured "in the Fall of 2015." (Ex 12.) Again though, this does not indicate onset within 48 hours of vaccination. In that regard Mrs. Duesterheft, despite recalling that onset occurred on the date of vaccination, averred that she created a contemporaneous calendar entry that places "reaction to flu shot" on September 27, 2015. (Ex. 16, p. 2; Ex. 15, p. 1.) This is consistent with the medical records insofar as when Mr. Duesterheft eventually began associating his shoulder pain to his vaccination in discussion with both his orthopedist and physical therapist, he was no more specific than to indicate that the shoulder pain began in September of 2015. (Ex. 5, pp. 20, 30.)

---

[5] Respondent notes that this should also allow greater weight to be placed on Dr. Castillo's earlier record of October 26, 2015, wherein Dr. Castillo did not note any shoulder problems just over one month after the vaccination at issue. (ECF No. 37, p. 2.)

[6] In contrast to Mr. Duesterheft's suggestion that he repeatedly raised his shoulder pain to his doctors, Mrs. Duesterheft recalled him as "presenting for treatment" beginning in March of 2016. (Ex. 16, p. 2.)

**V.      Conclusion**

In light of the above, there is not preponderant evidence that Mr. Duesterheft experienced right shoulder pain within 48 hours of his September 23, 2015 flu vaccination.


**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master
